**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ABDEL MONIEM ALI EL-GANAYNI,** ) | |
| **Plaintiff,** ) | |
| **v.** ) | **2:08-cv-881** |
| ) | |
| **UNITED STATES DEPARTMENT OF** ) | |
| **ENERGY and JEFFREY F. KUPFER,** ) | |
| **Acting Deputy Secretary of Department of** ) | |
| **Energy,** ) | |
| **Defendants.** ) | |

## MEMORANDUM ORDER

Pending before the Court is the MOTION TO DISMISS (Document No. 20) filed by

Defendants United States Department of Energy and Jeffrey F. Kupfer, Acting Deputy Secretary

(collectively, "DOE"). Plaintiff has filed a brief in opposition (Document No. 30). The Court

conducted oral argument on October 14, 2008 and the motion is ripe for disposition. The Court

is aware of the exigent circumstances claimed by Plaintiff and his pending request for injunctive

relief.[1]

## Factual Background

Plaintiff challenges Defendants' decision to revoke his security clearance on the basis of

"national security." The relevant facts, as set forth in the Complaint, will be taken as true at this

stage of the case. Dr. El-Ganayni is a native-born Egyptian who came to the United States in

1980. In 1988 he became a United States citizen. Dr. El-Ganayni earned Masters and Ph.D.

---

[1]Because Defendants challenge the Court's subject-matter jurisdiction, the instant motion must be resolved as a predicate to consideration of Plaintiff's motion for injunctive relief (Document No. 11) and the parties' cross-motions regarding discovery (Document Nos. 13, 21).

degrees in physics, married an American citizen, was active in establishing an Islamic Mosque, the Islamic Center of Pittsburgh, and participated in other Muslim ministerial and charitable activities, all of which he disclosed appropriately to his employer.

In 1990, Dr. El-Ganayni was hired as a physicist at Bettis Laboratory, a facility operated under contract with the Department of Energy that is solely dedicated to the Naval Nuclear Propulsion Program (i.e., nuclear-powered warships). Dr. El-Ganayni's employment required a security clearance. In seventeen years at Bettis, Plaintiff never received a negative performance evaluation and was never accused of misconduct.

Dr. El-Ganayni engaged in religious and political activity in the time period preceding the suspension of his security clearance. He spoke out against the government's treatment of Muslims, including criticism of a raid on the Light of Age Mosque during the Juma'h prayer service, the presence of FBI recruiting brochures inside a Monroeville Mosque, and United States foreign policy in Iraq. Plaintiff entered into a contract to provide Islamic religious services for the Pennsylvania state prison system, but after he complained about several incidents regarding the treatment of Muslim inmates, the contract was cancelled.

On October 24, 2007, Plaintiff was subjected to seven hours of interviews by Bettis and DOE officials. The questions focused on Dr. El-Ganayni's religious beliefs as a Muslim, his work as an Imam in the Pennsylvania prison system, his political views about America's war with Iraq, and speeches he gave at local Mosques criticizing the FBI's mistreatment of and disrespect for Muslims. There were no questions related to security breaches at Bettis or the mishandling of classified information. At the conclusion of the questioning, the Bettis Security Manager read a prepared statement informing Dr. El-Ganayni that his security clearance was

suspended pending "resolution of issues."  Dr. El-Ganayni was then escorted out of the building.

Two weeks later, Dr. El-Ganayni  was interviewed by FBI agents.  The agents advised him that DOE had asked the FBI to determine whether he should continue to hold his security clearance.  Many questions were simply repeated from the October 24 interview.  In addition, the FBI asked questions about whether he had given a speech attacking America or the FBI, had "led a prayer asking Allah to grant victory over disbelievers (which is in fact one of the Islamic prayers that is said at virtually every service)," Complaint ¶ 50(c), his interpretation of the Qur'an, his beliefs about martyrdom, whether he was a member of Hamas, the Muslim Brotherhood or Al-Qaeda, and whether he ever watched television or internet broadcasts in which Americans were killed in Iraq.

In December 2007, Dr. El-Ganayni received a letter dated December 5, 2007 from P.E. Salm, Manager of the Schenectady office of DOE, advising him that he was suspended with pay based on "reported information, which raises a substantial doubt concerning your continued eligibility for a clearance."  The letter further stated that DOE was in possession of information which indicated that "continuation of your access authorization may endanger the common defense and security."  On December 12, 2007, Dr. El-Ganayni was placed on reduced pay for the length of the suspension.

In January 2008, Dr. El-Ganayni received another letter from Mr. Salm dated January 14, 2008, which notified him that DOE had significant concerns and advised him of the procedural rights in the resolution of his eligibility.  The letter described the reasons for the suspension of his security clearance as follows:

Reliable information in the possession of the Department of Energy indicates that

you have knowingly established or continued sympathetic association with a saboteur, spy, terrorist, traitor, seditionist, anarchist, or revolutionist, espionage agent, or representative of a foreign nation whose interests are inimical to the interests of the United States, its territories or possessions, or with any person advocating the use of force or violence to overthrow the Government of the United States or any state or subdivision thereof by unconstitutional means. Reliable information in the possession of the Department of Energy indicates that you have engaged in unusual conduct or are subject to circumstances which tend to show that you are not honest, reliable, or trustworthy; or which furnishes reason to believe that you may be subject to pressure, coercion, exploitation, or duress which may cause you to act contrary to the best interests of national security. Specifically, the circumstances or conduct involve conflicting allegiances.

This language simply tracked the language in 10 C.F.R. § 710.8(b) and (l) and did not provide any factual details.

Dr. El-Ganayni accepted DOE's offer to contest the decision and requested a hearing pursuant to the procedure set forth in the January 14, 2008 letter. On April 4, 2008, Dr. El-Ganayni received a letter from the DOE Hearing Officer appointed in his matter, seeking to convene a telephone conference "[i]n view of the paucity of information contained in the Notification Letter dated January 14, 2008." During the telephone conference, the Hearing Officer advised DOE that the January 14 Letter was facially deficient because it failed to provide notice of the allegations against Dr. El-Ganayni. DOE counsel responded that DOE was no longer relying on the language of the January 14 Letter and did not intend to provide additional notice.

Another telephone conference was held on May 19, 2008. DOE counsel announced that Acting Deputy Secretary of Energy Jeffrey Kupfer had signed a certification regarding Dr. El-Ganayni earlier that day (the "Kupfer Certification"). The cover letter delivered to the Hearing Officer stated: "In accordance with Section 5.2(d) and (e) of Executive Order 12968, the Deputy

Secretary's action is conclusive, rendering moot the above-referenced proceeding."

The Kupfer Certification made the following "certification and determinations":

1. In accordance with Section 5.2(d) of Executive Order 12968 (*Access to Classified Information*) (August 4, 1995), I certify that the procedures set forth in Section 5.2(a) of the Executive Order and in the Department of Energy's regulations at 10 C.F.R. § 710.26-710.30 cannot be made available to Mr. El-Ganayni without damaging the interests of national security by revealing classified information. This certification is conclusive.

2. In accordance with Section 5.2(e) of Executive Order 12968, I have determined that the procedures prescribed by subsection (a) of Section 5.2 of the Executive Order cannot be invoked in a manner that is consistent with national security.

3. Pursuant to the authority granted to the Secretary of Energy by section 145 of the Atomic Energy Act of 1954, as amended (42 U.S.C. § 2165), I hereby terminate Mr. El-Ganayni's access to classified information in the interests of national security.

4. The determinations in paragraphs 2 and 3 hereof are conclusive.

On May 22, 2008, Plaintiff received notice that because his security clearance was revoked he was no longer eligible to work at Bettis and was discharged from his employment.

This litigation followed. Plaintiff alleges that "Defendants' actions, made in retaliation for Dr. El-Ganayni's exercise of constitutionally protected free-speech rights and because of his religious affiliation, inflict irreparable harm for which there is no adequate remedy at law." Plaintiff asks this Court to enjoin "defendants from using the national-security certification to shield their clearance-revocation decision from scrutiny." Count I alleges a violation of First Amendment rights (speech and religion). Count II alleges a violation of Equal Protection rights under the Fifth Amendment. Count III alleges a Due Process violation of agency regulations under the Administrative Procedure Act and the Fifth Amendment. On all counts, Plaintiff seeks

as relief a declaration that Defendants' actions violated his constitutional rights and an order requiring DOE to provide him notice and hearing procedures consistent with the Constitution and DOE regulations to review the security-clearance revocation determination.

**Legal Analysis**

This is a difficult and important case that implicates the constitutional separation of powers between the executive and judicial branches. On the one hand, Dr. El-Ganayni asserts violations of his fundamental constitutional rights and argues that there must be some judicial remedy. On the other hand, Defendants contend that the revocation of a security clearance by the executive branch on the basis of "national security" is not reviewable by the courts.

Defendants contend that Counts I and II should be dismissed for lack of jurisdiction. Defendants concede that the Court has jurisdiction to consider Count III but contend that it fails to state a valid claim. The Court will address these arguments seriatim.

A.      Counts I and II

Defendants argue that Plaintiff is challenging the merits of the decision to revoke his security clearance, which is foreclosed by *Department of Navy v. Egan*, 484 U.S. 518 (1988). In *Egan*, the Supreme Court explained that the Constitution gives the President, as Commander in Chief of the armed forces, the authority to classify and control access to information bearing on national security and to determine whether individuals may have access to such information. 484 U.S. at 527. This power "exists quite apart from any explicit congressional grant." *Id.* Presidents, most recently President Clinton in Executive Order 12968, August 2, 1995, have

issued a series of Executive Orders that delegate the responsibility to protect and classify sensitive information to agency heads.

The Supreme Court explained in *Egan* that "no one has a 'right' to a security clearance." *Id.* at 528. Rather, the grant of a clearance requires an affirmative, discretionary act on the part of the granting official. It does not equate to a judgment about an individual's character. The granting or denying of clearances is an inexact science that requires a "predictive judgment" "made by those with the necessary expertise in protecting classified information." *Id.* at 529. The Court explained that "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment" or to "determine what constitutes an acceptable margin of error in assessing the potential risk." *Id.*

Plaintiff recognizes that the Supreme Court has limited judicial review of security-clearance revocations, such that "[w]here an agency has followed proper procedures, the courts cannot second guess the agency's exercise of discretion in making the final decision to revoke a clearance." Brief in Opposition to Motion to Dismiss at 2. However, Plaintiff contends that the power to invoke national security concerns, "virtually unreviewable by the judiciary," is dangerous and should be narrowly construed. Plaintiff reasons that the decision at issue in this case is not controlled by *Egan* because Defendants cited national security as the reason that the revocation process, i.e., the regulations promulgated to implement Executive Order 12968, could not be followed. Plaintiff contends that *Egan* does not prevent constitutional challenges to the decision or to the agency's process.

The Court recognizes Plaintiff's legitimate concerns with unbridled executive power and is loath to conclude that it does not have jurisdiction to adjudicate a claim that an American

citizen's fundamental constitutional rights had been violated. *See, e.g., In re Washington Post*, 807 F.2d 383, 391-92 (4th Cir. 1986) (observing that the spectre of a threat to "national security" may be used to justify a wide variety of repressive government actions). In *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the Supreme Court rejected the government's arguments based on separation of powers and institutional capabilities of courts in matters of military decision-making and held that a citizen-detainee seeking to challenge classification as an enemy combatant must receive notice of the factual basis for the classification and a fair opportunity to rebut those facts before a neutral decision-maker. Nevertheless, the Court is forced to acknowledge that in this case Defendants' interpretation of controlling precedent appears to be correct.

*Egan* discusses the authority of the Executive in security clearance matters in rather sweeping terms. The Supreme Court explained that the strong presumption of judicial review "runs aground when it encounters concerns of national security," such as where the granting of a security clearance to a particular employee is committed to an agency of the Executive branch. 484 U.S. at 526-27. Subsequent courts have recognized that *Egan* stands for the broad principle that "federal courts may not review security clearance decisions on the merits." *Stehney v. Perry*, 101 F.3d 925, 932 (3d Cir. 1996).

Plaintiff relies heavily on *Webster v. Doe*, 486 U.S. 592 (1988) (involving a claim by a CIA employee that he was fired because of his homosexuality). The Court held that judicial review of the Director's decision under the Administrative Procedures Act was precluded, but that the federal courts could entertain the employee's colorable constitutional claims. However, *Webster* is distinguishable because it was a statutory interpretation case, which construed the

8

delegation of power to the Director of CIA contained in § 102(c) of the National Security Act, 50 U.S.C. § 403(c). By contrast, the authority of the executive branch to revoke security clearances is not derived from a statute, but flows directly from the United States Constitution, Art. II, § 2, "and exists quite apart from any explicit congressional grant." *Egan*, 484 U.S. at 527. Thus, the fact that Congress did not empower the CIA Director to evade judicial review of constitutional claims when terminating an employee is not precedential to the issues in this case.

The United States Court of Appeals for the Third Circuit attempted to reconcile *Egan* and *Webster* in *Stehney v. Perry*, which involved a long-time employee of a defense contractor who was terminated after her security clearance was revoked when she refused to take a polygraph examination. In *Stehney*, the Court of Appeals summarized that under *Egan*, "federal courts may not review security clearance decisions on the merits" on grounds of institutional competence, separation of powers and deference to the Executive on national security matters. *Id.* at 932 (citations omitted). The Court of Appeals made a distinction between challenges to the **merits** of a security clearance revocation decision and challenges arising from the clearance revocation **process**. 101 F.3d at 932; *See Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008) (*Stehney* "noted that there was a distinction between challenging the merits of a clearance revocation and challenging the revocation process, and we had jurisdiction to rule on the latter.") The ability to raise constitutional challenges does not enable litigants (or courts) to second-guess revocation decisions on the merits. The courts may only adjudicate those constitutional claims that do not violate the separation of powers or involve political questions.[2] 101 F.3d at 932. If a

---

[2]As will be discussed *supra*, courts also have the power to review whether an agency followed its own regulations and procedures during the revocation process. *Stehney*, 101 F.3d at 932.

litigant asks for a review of the merits of a decision to revoke a security clearance, courts should decline to adjudicate the claim. *Id.* In *Makky*, the plaintiff acknowledged that he was foreclosed from challenging the security clearance decision "even if it were denied due to discrimination." 541 F.3d at 213; *Accord Hill v. Department of Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1988) (if *Egan* can be bypassed simply by invoking constitutional rights, its authority would be "hardly worth the effort").

The Court must now apply this legal framework to Counts I and II of Dr. El-Ganayni's Complaint. The Executive branch, in the person of Acting Deputy Secretary of Energy Jeffrey Kupfer, has certified that Dr. El-Ganayni's access to classified information was terminated in the interests of national security. Kupfer further certified that the procedural protections set forth in the Executive Order and regulations could not be made available to Dr. El-Ganayni without damaging the interests of national security. In Count I, Plaintiff asserts that "the decision to suspend and revoke Dr. El-Ganayni's security clearance was made in retaliation for Dr. El-Ganayni's exercise of his rights to freedom of speech and religion, and Dr. El-Ganayni's security clearance would not have been suspended and revoked but for his exercise of those rights." Complaint ¶ 76. In Count II, Plaintiff asserts that "the decision to suspend and revoke Dr. El-Ganayni's security clearance was based on his religion and national origin, and Dr. El-Ganayni's security clearance would not have been suspended and revoked but for his religion and national origin." Complaint ¶ 84. At both Counts, Plaintiff seeks a declaration that Defendants violated his constitutional rights and an order requiring DOE to provide notice and hearing procedures to review the security clearance revocation determination.

The substantive arguments that Plaintiff seeks to assert would necessarily require the

Court to second-guess the merits of the Executive branch invocation of national security. In essence, Dr. El-Ganayni seeks to establish that Defendants' assertion of "national security" is pretextual, and that the real reason(s) would prove to be violative of his constitutional rights. It is inescapable that in order to adjudicate Plaintiff's claims, the Court will be forced to evaluate the basis for the action of the executive branch. *Egan* explained that courts are ill-equipped to review the predictive judgment embodied in such an agency determination, and therefore, that the courts must defer to the executive. In sum, despite Plaintiff's valiant efforts to avoid *Egan*, the claims made in Counts I and II of the Complaint necessarily require analysis of the merits of the revocation decision.

Similarly, the relief sought by Plaintiff in Counts I and II would require the Court to second-guess the Executive branch. Kupfer certified that following the regulatory procedures would not be consistent with national security. Plaintiff would have this Court override this certification and order that such procedures be made available. There are no clear principles by which the Court may decide which party is correct. In *Egan*, the Supreme Court explained that an outside nonexpert body cannot reasonably review the substance of the agency's predictive judgment or determine what constitutes an acceptable level of risk. Again, *Egan* dictates that the court yield to the decision of the Executive.

In summary, although there is a strong presumption of judicial review and the Court recognizes the potential abuse of unconstrained, unreviewable assertions of "national security" by the Executive branch, the Court reluctantly concludes that it lacks subject-matter jurisdiction to adjudicate the claims made in Counts I and II of the Complaint or to grant the relief sought therein. Accordingly, Defendants' Motion to Dismiss Counts I and II will be granted.

B.      Count III

In Count III, Plaintiff alleges a due process violation of agency regulations under the Administrative Procedure Act and the Fifth Amendment of the United States Constitution. Defendants concede that this Court has jurisdiction to review Plaintiff's claim that DOE failed to follow its own procedures, but they contend that Count III fails to state a valid claim.

1.      The Regulatory Scheme

The Kupfer Certification cited to the authority granted by Executive Order 12968 §§ 5.2(d) and (e).[3]  The preamble to Executive Order 12968 recognizes the need to protect classified information "while protecting fair and equitable treatment to those Americans upon whom we rely to guard our national security."  Section 5.2(c) of the Executive Order requires agency heads to promulgate regulations to implement the procedures for reviewing denials or revocations of security clearances.  The DOE promulgated such regulations, which are set forth at 10 C.F.R. Part 710, §§ 710.1-710.36.  Section 5.2(d) of the Executive Order states (emphasis added):

> When the **head of an agency or principal deputy** personally certifies that **a procedure set forth in this section** cannot be made available in a particular case without damaging the national security interests of the United States by revealing classified information, the **particular procedure** shall not be made available. This certification shall be conclusive.

---

[3]The Kupfer Certification also cited to 42 U.S.C. § 2165.  Plaintiff argues that this statutory provision does not discuss revocation of access.  In *Egan,* the Supreme Court explained that a security clearance requires an affirmative act of discretion on the part of the government. Section 2165 reflects this in its phrasing: "No arrangement shall be made . . . unless . . . ."  The phrase "permitting such person to have access to Restricted Data" is sufficiently broad to encompass the authority to revoke access.

Section 5.2(e) states (emphasis added):

> This section shall not be deemed to limit or affect the responsibility and power of an **agency head** pursuant to any law or other Executive order to deny or terminate access to classified information in the interests of national security. The power and responsibility to deny or terminate access to classified information pursuant to any law or other Executive order may be exercised **only** where the **agency head** determines that the **procedures prescribed in subsection (a)** of this section cannot be invoked in a manner that is consistent with national security. This determination shall be conclusive.

Section 7.2(c) states, in relevant part (emphasis added):

> No prior Executive orders are repealed by this order. To the extent that this order is inconsistent with any provision of any prior Executive order, this order shall control, **except** that this order shall not diminish or otherwise affect the requirements of Executive Order No. 10450, [or] **the denial and revocation procedures provided to individuals covered by Executive Order No. 10865**, as amended....

> Executive Order 10865 is entitled "Safeguarding Classified Information within industry."

Section 3 provides that security authorization "may not be finally denied or revoked . . . unless the applicant has been given the following: [listed procedural protections]." Sections 4 and 5 provide a limited mechanism to certify that certain witnesses or evidence need not be disclosed to the applicant, but in such instances, the final decision to revoke a clearance must be made by the "head of the department" after a personal review of the case.[4] Section 9 states (emphasis added):

> Nothing contained in this order shall be deemed to limit or affect the responsibility and powers of the **head of a department to deny or revoke access** to a specific classification category if the security of the nation so requires. **Such authority may not be delegated** and may be exercised **only** when the **head of a department** determines that the procedures prescribed in sections 3, 4, and 5 cannot be invoked consistently with the national security and such determination shall be conclusive.

---

[4]Section 8, as amended by Executive Order 10909, states that "[e]xcept as otherwise specified," authority vested in the agency head may be delegated to the principal deputy.

2. The Decision at Issue

Plaintiff argues that he "was denied every single procedural protection or safeguard available under D.O.E. regulations." Brief in Opposition to Motion to Dismiss at 10. However, the Complaint alleges that Dr. El-Ganayni did initially have the right to receive the procedures available for challenging the revocation of his security clearance. The Complaint avers that he received two letters from P.E. Salm of DOE, which notified him of his suspension (albeit without explanation) and that DOE had significant concerns regarding his clearance (again without explanation) and advised him of his procedural rights in the resolution of his eligibility. A copy of 10 C.F.R. Part 710 was provided with the January 14, 2008 letter. Thereafter, Dr. El-Ganayni was permitted to contest the DOE's decision and his case was assigned to a Hearing Officer. The Hearing Officer took some preliminary steps to advance Dr. El-Ganayni's appeal, including phone conferences and making a determination that Salm's letter of January 14, 2008 was "facially deficient."[5] Plaintiff has not challenged these steps. Rather, Plaintiff contests Defendants' action on May 19, 2008, via the Kupfer Certification, to preempt and render moot the procedures that had been initiated.

3. Constitutional Challenges

Plaintiff contends generally that Defendants' position is inconsistent with basic tenets of our democracy. Defendants respond that Plaintiff has no constitutional due process rights regarding this matter. *Egan* states that it is "obvious" that no person has a property right to a

---

[5] Defendants contend that the Kupfer Certication that was prepared pursuant to the process set forth in Executive Order 12968 also constituted a procedural protection or safeguard of Dr. El-Ganayni's rights.

security clearance.  484 U.S. at 528.  To establish a protected liberty interest, a plaintiff must

show that the defendants seriously damaged his standing in the community or imposed a stigma

or disability that forecloses his ability to obtain other employment.  *Robb v. City of Philadelphia*,

733 F.2d 286, 294 (3d Cir. 1984) (citation omitted).  In *Egan*, the Supreme Court established that

denial of a security clearance does not impugn an individual's character.  484 U.S. at 528-29.

In *Greene v. McElroy*, 360 U.S. 474 (1959) (involving revocation of a private engineer's

security clearance), the Supreme Court stated in dicta that the right to hold private employment

free from unreasonable governmental interference comes within the liberty and property concepts

of the Fifth Amendment.  *Id.* at 492.  The Supreme Court further commented:

> Certain principles have remained relatively immutable in our jurisprudence. One
> of these is that where governmental action seriously injures an individual, and the
> reasonableness of the action depends on fact findings, the evidence used to prove
> the Government's case must be disclosed to the individual so that he has an
> opportunity to show that it is untrue. While this is important in the case of
> documentary evidence, it is even more important where the evidence consists of
> the testimony of individuals whose memory might be faulty or who, in fact, might
> be perjurers or persons motivated by malice, vindictiveness, intolerance,
> prejudice, or jealousy. We have formalized these protections in the requirements
> of confrontation and cross-examination. They have ancient roots.

*Id.* at 496.  However, the Supreme Court decided *Greene* on the "narrower ground of

authorization."  *See Stehney*, 101 F.3d at 936 & n.8 (discussing *Greene*); *Cafeteria and

Restaurant Workers Union v. McElroy*, 367 U.S. 886, 889 (1961).  Moreover, the *Greene* Court

recognized the preliminary question of whether "the President or Congress, within their

respective constitutional powers, specifically has decided that the imposed procedures are

necessary and warranted and has authorized their use."  360 U.S. at 507; *Stehney*, 101 F.3d at 936

(distinguishing *Greene* because the polygraph test at issue had been expressly authorized).  In

15

this case, Executive Order 12968 § 5.2(d) reflects just such an express, specific authorization by the President that otherwise-available procedures relating to security clearance revocations may be withheld due to concerns regarding national security. The Court of Appeals for the Third Circuit has concluded that it is not clear that a due process claim exists at all under these facts. *Stehney*, 101 F.3d at 936. "Since [*Egan*], every court of appeals which has addressed the issue has ruled that a person has no constitutionally protected liberty or property interest in a security clearance or a job requiring a security clearance." *Id.* (citations omitted). Thus, Plaintiff's constitutional claims to a particular process must fail.

However, it is clear that an affected private employee has standing to challenge the security clearance revocation decision and that courts may adjudicate a claim that the government has failed to follow its own procedures. *Stehney*, 101 F.3d at 930-31; *Accord Hill*, 844 F.2d at 1411 (rejecting constitutional claims based on property and liberty interests but stating: "Constitutional questions aside, however, courts do have the power to compel agencies to follow their own regulations.") This action is properly framed as a suit under the Administrative Procedure Act. *Stehney*, 101 F.3d at 934. The remedy, if Plaintiff is successful, is a remand to the agency with instructions to comply with the appropriate and applicable procedures. *Hill*, 844 F.2d at 1412.

### 4.    Specific Challenges to Defendants' Actions

Plaintiff contends that Defendants failed to comply with their own rules in several respects: (a) that the regulations do not provide a mechanism for bypassing the entire regulatory process; (b) that only the Secretary of Energy had the authority to issue the certification; and (c)

that the certification had to address whether each "particular procedure" could be made available. The Court, in researching the parties' contentions, has encountered concerns that prevent the granting of Defendants' motion to dismiss Count III at this time.

As a preliminary matter, the Court must determine the appropriate standard of review of the agency's interpretation of the Executive Order and regulations. Neither party has discussed this issue. In *Contractors Ass'n of E. Pa. v. Sec'y of Labor*, 442 F.2d 159, 175 (3d Cir.1971), our Court of Appeals held that in general "courts should give more than ordinary deference to an administrative agency's interpretation of an Executive Order or regulation which it is charged to administer." It is at least arguable, given the legitimate concerns regarding the non-reviewable exercise of power claimed by the executive branch in this case, that a less deferential standard should be applied.

More substantively, Plaintiff argues strenuously that Kupfer lacked authority in this instance.[6] Kupfer was the acting "principal deputy" of the Department of Energy.[7] Kupfer Certification ¶ 2 is based on Executive Order 12968 § 5.2(e), which vests power with the "agency head" to "determine[] that the procedures prescribed in subsection(a) of this section cannot be invoked in a manner that is consistent with national security." Kupfer Certification ¶ 3 explicitly relied on the "authority granted to the Secretary of Energy" in 42 U.S.C. § 2165 as

---

[6]Plaintiff's primary argument is based on 10 C.F.R. § 710.31. Because the Court concludes that Executive Order 12968 is self-actuating, as explained *supra*, § 710.31 is not controlling.

[7]The parties have not contested this fact. In any event, the Court is entitled to take judicial notice of an official government document, such as an organization chart, that is available on the agency's website. *In re Wellbutrin SR/Zyban Antitrust Litigation*, 281 F. Supp.2d 751, 754 n.2 (E.D. Pa. 2003). *See* http://www.energy.gov/organization/orgchart.htm

the sole basis for actually terminating Dr. El-Ganayni's access to classified information. Thus, the question is whether the power vested in the Secretary was properly delegable to Kupfer.

Congress authorized the Secretary of Energy to delegate authority as part of the Department of Energy Organization Act, 42 U.S.C. § 7252, as follows:

> Except as otherwise expressly prohibited by law, and except as otherwise provided in this chapter, the Secretary may delegate any of his functions to such officers and employees of the Department as he may designate, and may authorize such successive redelegations of such functions within the Department as he may deem to be necessary or appropriate.

Defendants submitted a "Delegation of Authority" from Secretary of Energy Dr. Samuel Bodman dated May 9, 2008 as an exhibit to their motion to dismiss. Plaintiff has not disputed the authenticity of the May 9, 2008 Delegation of Authority and counsel for both parties discussed actions taken pursuant to that delegation at great length during oral argument.

Nevertheless, there remains an issue as to whether the Secretary may properly delegate his authority for the action taken in this case. The parties have not analyzed or discussed the interaction between Executive Order 12968 and Executive Order 10865. Executive Order 12968 § 7.2(c) explicitly states that the denial and revocation procedures provided to individuals covered by Executive Order 10865 were not diminished or otherwise affected. Indeed, in the event of inconsistencies, it appears that Executive Order 10865 would control. There is at least an arguable conflict between Executive Order 12968 § 5.2(d), which empowers the "head of an agency or principal deputy" to determine that the procedures cannot be invoked in a manner that is consistent with national security, and Executive Order 10865 § 9, which states that the authority of the "head of a department" to determine that the procedures cannot be invoked in a manner that is consistent with national security "may not be delegated." The Court has not found

any case law in which the dichotomy of these Executive Orders has been addressed or reconciled. Defendants' action, through the principal deputy, could appear to be inconsistent with Executive Order 10865. Thus, the Court is unable to conclude as a matter of law, on this record, that Defendants abided by their own rules and regulations.

In sum, in light of the unresolved legal issues discussed above, the Court concludes that the motion to dismiss should be taken under advisement as to Count III. As set forth below, the Court solicits supplemental briefing on the issues of: (1) the standard of review of the agency's interpretation of the Executive Orders; and (2) the relationship and application of Executive Orders 12968 and 10865.


5.      Other Arguments

In the interest of streamlining the remaining issues in light of the exigent circumstances claimed by Dr. El-Ganayni, the Court will resolve Plaintiff's argument that Defendants cannot bypass all procedural protections as a group, but must analyze the national security implications of each specific right. Plaintiff seizes on the reference in § 5.2(d) to "the particular procedure." However, under the terms of § 5.2(d) the certification need only state that "a procedure set forth in this section" cannot be made available. No particular level of specificity in this certification is required. Here, Defendants did not globally revoke all procedures. Rather, Kupfer certified that "the procedures set forth in Section 5.2(a) of the Executive Order and in the Department of Energy's regulations at 10 C.F.R. § 710.26-710.30" could not be made available to Plaintiff. While Kupfer did not list each subparagraph of each section and provide a specific explanation, the Court concludes that he appropriately recited "the particular procedures" that would, in his

view, adversely affect national security.

The Court will also resolve Plaintiff's argument that the implementing regulations in 10 C.F.R. Part 710 do not authorize the action taken by Defendants. In short, Executive Order 12968 is self-actuating. Executive Order 12968 § 5(c) (which required the promulgation of regulations) states: "This section does not require additional proceedings, however, and creates no procedural or substantive rights." The Kupfer Certification did not purport to rely on the regulations and therefore, they are largely irrelevant. The proper focus is to be whether Defendants' actions complied with the applicable Executive Order(s).

In accordance with the foregoing, the MOTION TO DISMISS (Document No. 20) filed by Defendants is **GRANTED as to Counts I and II and TAKEN UNDER ADVISEMENT as to Count III**. The parties shall each file a Supplemental Brief in which the issues raised in this Memorandum Order shall be addressed on or before November 14, 2008.

SO ORDERED this 31st day of October, 2008.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc: Keith E. Whitson, Esquire
Email: kwhitson@schnader.com
Paul H. Titus, Esquire
Email: ptitus@schnader.com
George E. McGrann, Esquire
Email: gmcgrann@schnader.com
Witold J. Walczak, Esquire
Email: vwalczak@aclupgh.org

Marcia K. Sowles, Esquire
Email: Marcia.Sowles@usdoj.gov